# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

## FILED UNDER SEAL



**UNITED STATES OF AMERICA,**
*ex rel* ARINA CADARIU, and
**THE STATE OF CONNECTICUT,**

      **Plaintiffs,**

**vs.**

**NORTHEAST MEDICAL GROUP,
YALE NEW HAVEN HEALTH SYSTEM
CORPORATION, AND BRIDGEPORT
HOSPITAL**
      **Defendants.**

CIVIL ACTION NO:

3:19 cv 904 (MPS)

---

## FALSE CLAIMS ACT COMPLAINT

---

**Charles C. Goetsch, Esquire**
**CHARLES GOETSCH LAW OFFICES, LLC**
405 Orange Street
New Haven, Connecticut 06511
Tel:  (203) 672-1370
Fax:  (203) 776-3965
E-mail:  charlie@gowhistleblower.com

Attorney for Plaintiff, Arina Cadaiu

# TABLE OF CONTENTS

I.      INTRODUCTION...................................................................  1

II.     NATURE OF ACTION .........................................................  1

III.    JURISDICTION...................................................................  2

IV.     VENUE................................................................................  2

V.      PARTIES..............................................................................  3

        Relator...............................................................................  3

        Defendants........................................................................  3

VI.     THE FEDERAL FALSE CLAIMS ACT...............................  4

VII.    THE CONNECTICUT FALSE CLAIMS ACT..........................  5

VIII.   THE MEDICARE PROGRAM..............................................  6

IX.     THE MEDICAID PROGRAM...............................................  6

X.      BILLING STANDARD FOR NPP MEDICARE/MEDICAID
        CLAIMS...............................................................................  8

        A. CMS Billing Standard for Non-Physician Practitioners..............  8
        B. Standard for Physician Documentation of Face-to-Face
           Encounters.......................................................................  9

XI.     FALSE NPP HOSPITALIST BILLINGS..................................  11

        A. Nature of False NPP Billings at Bridgeport Hospital.................  11
        B. Summary of Steps in the Scheme......................................  14
        C. False Split Shared Services Scheme..................................  15
        D. Examples of Mid-Level Services Falsely Billed at Physician Rate.  17
        E. Corrected Bills NEMG Changed Back to False Claims..............  21

XII.    FALSE DISCHARGE BILLINGS…………………………………… 24

XIII.   FALSE RESIDENT CONSULT BILLINGS ………………………… 26

XIV.   FALSE PROGRESS NOTES………………………………………... 28

XV.    DAMAGES……………………………………………..………… 29

XVI.   LEGAL CLAIMS FOR RELIEF……………………………………. 30

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

### FILED UNDER SEAL



**UNITED STATES OF AMERICA,**
*ex rel* **ARINA CADARIU, and**
**THE STATE OF CONNECTICUT,**

      **Plaintiffs,**

                                     **CIVIL ACTION NO:**
                                      3:19cv 904(MPS)

**vs.**

**NORTHEAST MEDICAL GROUP,**
**YALE NEW HAVEN HEALTH SYSTEM**
**CORPORATION, AND BRIDGEPORT**
**HOSPITAL**
        **Defendants.**

### FALSE CLAIMS ACT COMPLAINT

I.      **INTRODUCTION**

    The Plaintiff Relator Dr. Arina Cadariu brings this action against the defendants on behalf of herself and the United States of America and the State of Connecticut to recover monies defendants wrongfully obtained from the Medicare and Medicaid programs through false and fraudulent claims for payment. For their causes of action, the plaintiffs allege as follows:

II.     **NATURE OF ACTION**

    1. The Plaintiffs bring this action to recover statutory damages and civil penalties under the federal False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), and the Connecticut False Claims Act, as amended, Conn. Gen. Stat. §§ 4-274 through 4-289.

1

This action arises out of the defendant's improper submission of claims to the Medicare and Medicaid programs, and exposes, *inter alia,* systematic false billing for consultations, progress notes, and Non Physician Provider service encounters.

III.   **JURISDICTION**

2. This Court has subject matter jurisdiction to entertain this False Claims Act action under 28 U.S.C. §§ 1331 and 1345. The Court possesses supplemental jurisdiction to entertain the Connecticut state law causes of action pursuant to 28 U.S.C. § 1367(a) and 31 U.S.C. §3732(b).

3. This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a) because defendants reside in and transact business in this District, and because defendants committed acts within this District that violated 31 U.S.C. § 3729.

4. To the knowledge of the Relator, jurisdiction over this action is not barred by 31 U.S.C. § 3730(e) or the parallel provisions of the State FCA statute:  there is no civil suit or administrative proceeding involving the particular allegations and transactions described herein to which the United States of America or the State of Connecticut is a party; there has been no "public disclosure" of these allegations or transactions; and, in any event, Relator is an "original source" of the information upon which these allegations are based.

IV.   **VENUE**

5. Venue is proper in the District of Connecticut under 31 U.S.C. §3732 and 28 U.S.C. §1391(b) because defendants reside and transact business in this District, and because defendants committed acts within this District that violated 31 U.S.C. §3729.

V.     PARTIES

Relator

6. Dr. Arina Cadariu, M.D., M.P.H., is a board certified physician in internal medicine residing in East Haven, Connecticut. From 2003 to the present she has been employed by the Northeast Medical Group (NEMG) as an Attending Hospitalist, and also serves as an Assistant Clinical Professor of Medicine at the Yale School of Medicine. From 2003 to 2015 she was a NEMG Hospitalist at the Yale New Haven Hospital on York Street in New Haven, and from 2015 to the present she has worked on a part-time basis as a NEMG Hospitalist at the Bridgeport Hospital.

Defendants

7. The Bridgeport Hospital is a 357 bed acute care hospital, and is a member of the Yale New Haven Health System. It is located at 267 Grant Street in Bridgeport, Connecticut. Approximately 80% of the patients treated at Bridgeport Hospital are covered by Medicare or Medicaid.

8. The Yale New Haven Health System Corporation, doing business as Yale New Haven Health System (YNHHS), is based at 789 Howard Avenue in New Haven, Connecticut. The YNHHS is the parent corporation that includes the Northeast Medical Group, Bridgeport Hospital, Greenwich Hospital, Lawrence + Memorial Hospital, Yale New Haven Hospital, Milford Hospital IRU, Gaylord Rehabilitation, and Westerly Hospital. With more than 25,000 employees and 8,200 medical staff, in Fiscal Year 2017 YNHHS had over 129,000 inpatient discharges, 2 million outpatient encounters, generated more than $4.3 billion in revenue, and accumulated total assets of approximately $5.6 billion.

3

9. The Northeast Medical Group (NEMG) is an affiliate of the Yale New Haven Health System, and has its administrative offices at 99 Hawley Lane in Stratford, Connecticut. The NEMG is a multi-specialty medical foundation consisting of more than 70 physician practices and 1,500 employees in Connecticut, Rhode Island, and Westchester County. The physicians it employs includes the internal medicine Hospitalists at the Bridgeport Hospital.

## VI.   THE FEDERAL FALSE CLAIMS ACT

10.    The FCA, 31 U.S.C. §§ 3729-3733, as amended by the Fraud Enforcement and Recovery Act of 2009, P.L. 111-21, § 4(f), 123 Stat. 1621, provides, in pertinent part:

(a)    Liability for certain acts.

In general. Subject to paragraph (2), any person who -- (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), or (G); ...or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government...is liable to the United States Government....

(b)    Definitions. For purposes of this section—

(1)    the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud;

(2)    the term "claim" (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or

agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

(3)     the term "obligation" means an established duty, whether or not fixed, arising from . . . statute or regulation, or from the retention of any overpayment.

## VII.    **THE CONNECTICUT FALSE CLAIMS ACT**

11.     The Connecticut False Claims Act provides, in pertinent part that:

(a)     No person shall:

**(1)**     Knowingly present, or cause to be presented, a false or fraudulent     claim for payment or approval under a state-administered health or human services program;

**(2)**     Knowingly makes, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program;

**(3)**     Conspire to commit a violation of this section;

(b)     Any person who violates the provisions of

subsection (a) of this section shall be liable to the state. . . .

*  *  *

As used in ... section 4-275: (1) "knowing" and knowingly" means that a person, with respect to information: (A) has actual knowledge of the information; (B) acts in deliberate ignorance of the truth or falsity of the information; or (C) acts in reckless disregard of the truth or falsity of the information, without regard to whether the person intends to defraud; . . . (7) "State-administered health or human services program" means programs administered by any of the following: . . . the Department of Social Services . . . including such programs reimbursed in whole or in part by the federal government.

Conn. Gen. Stat. § 4-274 and 4-275.

## VIII.    THE MEDICARE PROGRAM

12.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 — 13951ckk, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program.

13.     The Secretary of HHS has oversight authority for the Medicare Program and administers the Program through the Center for Medicare and Medicaid Services (CMS). Payments made under the Medicare Program include payment for services rendered at Bridgeport Hospital.

## IX.    THE MEDICAID PROGRAM

14.     Medicaid is a joint federal-state program that provides health care benefits for certain persons, including the indigent and disabled. The federal Medicaid statutes set forth the minimum requirements for state Medicaid programs to qualify for federal funding. 42 U.S.C. § 1396a. The federal share of each state's Medicaid payments is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d. State Medicaid programs pay the balance, which is referred to as the "state share." At all times relevant to this Complaint, the "state share" for the State of Connecticut's Medicaid program was approximately fifty percent (50%).

15.     The Connecticut Department of Social Services (DSS) administers the Connecticut Medical Assistance Program ("CMAP"), which includes the Connecticut Medicaid program. The DSS Commissioner is authorized to promulgate regulations as necessary to administer the CMAP. Regs. Conn. State Agencies § 17b-262-523 (13). The DSS reimburses participating providers for healthcare services provided to CMAP beneficiaries.

16.     All healthcare providers enrolled in the CMAP must comply with applicable statutes, regulations, and policy guidelines in order to be reimbursed by the CMAP. A provider has a legal duty to have knowledge of the statutes, regulations, and policy guidelines regarding coverage for CMAP services. A provider of goods and services to CMAP recipients is obligated to adhere to CMAP requirements in order to both participate in, and receive payment from, the CMAP through the DSS. Regs. Conn. State Agencies § 17b-262522.

17.     Every person, organization, and entity that wishes to voluntarily participate as a provider in the CMAP is required to enter into a CMAP Provider Enrollment Agreement (Provider Agreement).

18.     A CMAP provider agrees in the Provider Agreement "[t]o continually adhere to professional standards governing medical care and services and to continually meet state and federal licensure, accreditation, certification or other regulatory requirements, including all applicable provisions of the Connecticut General Statutes and any rule, regulation, or DSS policy promulgated pursuant thereto and certification in the Medicare program, if applicable." Provider Agreement, ¶ 3.

19.     A CMAP provider further agrees to "abide by DSS' Medical Assistance Program Provider Manual(s), as amended from time to time, as well as all bulletins, policy transmittals, notices, and amendments . . . ." Provider Agreement, ¶ 10.

20.     A CMAP provider also agrees in the Provider Agreement to "submit only those claims for goods and services that are covered by the Connecticut Medical Assistance Program and documented by Provider as being . . . for compensation that Provider is legally entitled to receive . . . ." Provider Agreement, ¶ 15.

7

21.    By executing the Provider Agreement, the CMAP provider, or the provider's authorized representative, acknowledges reading and understanding the entire Agreement. Provider Agreement, page 7.

22.    As participating providers in the CAMP, the defendants and/or the medical providers employed by NEMG have executed Provider Agreements.

## X.    BILLING STANDARD FOR NPP MEDICARE/MEDICAID CLAIMS

### A.    CMS Billing Standard for Non-Physician Practitioners

23.    Non-physician practitioners (NPPs) include Physician Assistants (PAs) and Advanced Practice Registered Nurses (APRNs), and often are referred to as "mid-levels." Such NPPs can treat patients only if they are under the appropriate supervision of a physician. As for billing for NPP services, both CMS and the Connecticut Department of Social Services are clear:

> if there was no face-to-face between the patient and the physician (e.g. if the physician participated in the service by only reviewing the patient's medical record) then the service may only be billed under the NPP's UPIN/PIN.

Medicare Claims Processing Manual, Chapter 12, Section 30.6.1.B "Selection of Level of E/M Service" (Pub. 100-04); Exhibit 1, Connecticut Department of Social Services Provider Bulletin 2016-68 (October 2016).

24.    The NPP's billing rate is 85% of a physician's 100% rate. Unless a physician documents actual face-to-face interaction with a NPP patient, the billing for that NPP patient can only be at the NPP's 85% rate. Billing CMS at the 100% rate when a physician merely reviews and cosigns a NPP note is a false claim.

B.     Standard for Physician Documentation of Face-to-Face Encounters

25.     When a physician and a NPP mid-level from the same group both treat a patient on the same day, CMS and Connecticut DSS allows the service to be billed under the physician's NPI at the physician's 100% rate. Such services are referred to as "split/shared" medical services.

26.     However, CMS and the Connecticut DSS will not pay the 100% rate unless certain documentation requirements are met. Chief among those is the requirement that the physician unequivocally documents that he or she personally performed a portion of the service. Merely attesting that he or she agrees with the findings of the mid-level is not enough. As the Connecticut DDS's Provider Bulletin explains:

> The documentation must show that the physician had a face-to-face encounter with the patient and performed a portion of the service. The physician cannot solely attest that he/she agrees with the findings that the NPP has already documented and sign off on the note. If the physician's participation is only a review of the patient's medical record, the service should be billed under the NPP's name and provider number and will be paid at the NPP reimbursement rate.

Exhibit 1. Such face-to-face documentation requires:

- A clearly stated reason why the work of the physician was required during the visit in addition to that of the NPP

- Documentation by the physician for the part(s) of the service that he or she personally provided

- Date the service was provided

*Id.* Thus, to qualify as a reimbursable face-to-face encounter, the physician must clearly document what portions of the E/M service the physician personally performed, and state why that work was required in addition to what was done by the NPP. The documentation must set forth what portions of the history, physical examinations, or medical decision

9

making components of the E/M service the physician personally performed face-to-face with the patient, and confirm it was done on the same day as the NPP service.

27.     The following are examples of physician documentation that would qualify as a face-to-face encounter:

> "I have personally performed a face to face diagnosis evaluation on this patient. My findings are as follows: [setting forth the detailed findings made by the physician separately from the mid-level NPP]"
> *Signed by treating physician*

> "I have personally performed a face to face diagnostic evaluation of this patient. I have reviewed and agree with the care plan. History and Exam by me shows: [setting forth the detailed findings made by the physician separately from the mid-level NPP]"
> *Signed by treating physician*

Exhibit 2. Such documentation confirms the portions of the E/M encounter personally performed by the physician, and allows billing under the physician's name. However, the following are a few examples of medical record documentation by the physician which would not be considered adequate to support a split/shared visit:

> ☐     "I have personally seen and examined the patient independently, reviewed the PA's History, exam and MDM and agree with the assessment and plan as written" signed by the physician

> ☐     "Patient seen" signed by the physician

> ☐     "Seen and examined" signed by the physician

> ☐     "Seen and examined and agree with above (or agree with plan)" signed by the physician

> ☐     "As above" signed by the physician

> ☐     Documentation by the NPP stating "The patient was seen and examined by myself and Dr. X., who agrees with the plan" with a co-sign of the note by Dr. X

☐      No comment at all by the physician, or only a physician signature at the end of the note

*Id.* Such documentation is insufficient to support split/shared billing because it does not unequivocally confirm a face-to-face encounter during which the physician personally performed elements of the E/M service. And it is insufficient because it does not set forth the detailed findings the physician personally made separately from the mid-level NPP.

28.      Thus the requirement for billing a NPP service under a physician's NPI is the same regardless of how it is characterized: without actual, medically necessary and properly documented face-to-face interaction between the physician and the patient, the encounter cannot be billed at the physician's rate. To bill such NPP services under the doctor's name is a false claim.

## XI.    FALSE NPP HOSPITALIST BILLINGS

### A.    Nature of False NPP Billings at Bridgeport Hospital

29.      At Bridgeport Hospital, physicians create the medical record for each of their own patients using the Epic Electronic Health Record (EHR) software program. The physicians sign off on those charts as true and accurate.  In the Epic EHR software system used throughout the YNHH system, each doctor creates their own short cut attestation phrases (.phrases) for signing a record. The content of these phrases varies among the physicians, but most doctors have one attestation for the charts of patients they see independently, one attestation for cosigning mid-level records (which is often just a signature, or a short statement indicating case was discussed with the mid-level and the chart reviewed), and one for cosigning records created by residents (created in compliance with JCAHO requirements).

11

30.     For Medicare and Medicaid patients personally treated by the physician (or by a Resident supervised by the physician), the physician then submits the record of the treatment encounter for billing to CMS. NEMG electronically submits the bills to Medicare and Medicaid with the physician's name as the Billing Provider.

31.     The NEMG administrators of the Hospitalist Department at Bridgeport Hospital are Dr. Sheik Mahfuz Hoq and Dr. Monique Misra. They assign NPP mid-level providers to evaluate and treat patients separately from a physician for the following services: admissions, discharges, death discharges, consults, and critical care. For those patient services, the mid-levels create the note in the chart, and then at the end of the shift forward them to one of the physicians to review and cosign.

32.     Before sending the chart to the supervising physician to review and cosign, the mid-levels determine the level of care and main diagnosis. The EHR is programmed to recognize the provider working on the record at any given moment, and thus automatically enters the name of the mid-level creating the note as both the Service Provider and the Billing Provider.

33.     However, the NEMG Hospitalist Department administrators at Bridgeport Hospital, Dr. Hoq and Dr. Misra, instruct the mid-levels to delete their mid-level name from the Billing Provider box and insert the name of the attending physician as the Billing Provider. This despite the fact the physicians have not performed any face-to-face services for the patient. As a result, the service provided by the NPP mid-level is charged to CMS at the physician's 100% rate rather than the correct 85% mid-level NPP rate.

34.     The fact NEMG instructs its mid-levels at Bridgeport Hospital to report a physician as the service provider in order to bill at 100% instead of 85% was confirmed

by NEMG mid-levels Wendy Awa on November 27, 2018, Karen Petrok on February 20, 2019, and Megan O'Connell on March 10, 2019. It also was confirmed by Assistant Hospitalist Director Monique Misra. On November 21, 2018, Dr. Arina Cadariu complained that a mid-level had improperly reported her as the Billing Provider "when in fact it should be the mid-level performing and billing for the service." Exhibit 3. Dr. Misra responded: "You are the billing provider when you review the admissions and consults with the APPs." *Id.* [1] As the CMS standards quoted above confirm, that statement is false. A physician who merely reviews the patient medical record created by the NPP cannot bill for that service; it can only be billed under the mid-level's NPI.

35.    Dr. Cadariu's November 21, 2018 email also complains that the charts created by NEMG mid-levels contain boilerplate phrases obliquely implying the involvement of physicians: "case was discussed with MD," or "case will be discussed with MD." Such stock phrases fall well short of the proper physician face-to-face encounter documentation required by CMS, and even if such "discussion" actually occurs, the charge still must be billed at the NPP's 85% rate. Despite Dr. Cadariu's highlighting this practice, it has continued unabated. For example, on January 15, 2019, NEMG mid-level Tenzin Palkey confirmed "I always write 'to be reviewed with attending' for everyone I work with." Exhibit 4.

---

[1] The acronym APP refers to Assistant Physician Providers, which is another term for mid-levels or Non Physician Providers (NPPs), and includes the Physician Assistants (PAs) and Advanced Practice Registered Nurse (APRNs) NEMG employs at Bridgeport Hospital.

B.    Summary of Steps in the Scheme

36.    The steps in this scheme are as follows. In the Epic Electronic Health Record software system utilized by NEMG, a mid-level creates a note for one of the following billable services:

- H&P initial hospital care (Codes 99221, 99222, 99223)

- Hospital discharge (Codes 99238, 99239)

- Death pronouncement discharge (Codes 99238, 99239)

- Observation care discharge (Code 99217)

- Initial observation care (Codes 99218, 99219, 99220)

- Inpatient consult (Codes 99251 – 99255, billed under Initial Hospital Care Codes 99231-99233 or Subsequent Hospital Care Codes 99231-99233)

- Critical care (Codes 99291, 99292)

37.    The Epic EHR program has a charge screen with a Service Provider box and a Billing Provider box. The Epic program automatically inserts the name of the mid-level creating the note as both the Service Provider and the Billing Provider, which is correct. However, that charge screen is not visible unless the charge button is clicked.

38.    When the mid-levels finish the note, they click on the charge button and open up the charge screen. The mid-levels can see their own name is in the Billing provider box. But the mid-levels are instructed to delete their name from the Billing Provider box and replace it with the name of the physician assigned to the mid-level for that shift. The mid-level's name remains in the Service Provider box.

39.    The mid-levels insert the physician's name as the Billing Provider knowing the physician has not had any face-to-face interaction with the mid-level's patient, and the mid-levels do so without even speaking to the physician.

40.     Every physician has an electronic in basket listing charts that need to be cosigned. After inserting the physician's name as the Billing Provider, the mid-level sends the note to the physician's in basket for cosigning.

41.     The note appears in the physician's in basket as a name in a list of patient names. The physician clicks on the patient's name in that list, and the only thing that opens up is the note to be signed. The charge screen is not visible. Without checking to make sure mid-level is correctly named as the Billing Provider, the physician cosigns the chart.

42.     As a result, CMS is billed for and pays the full 100% physician rate instead of the correct NPP 85% rate. But those claims are fundamentally false and should never have been submitted to, much less paid by, CMS. They are false because the NEMG physicians: merely review and endorse the medical record created by the mid-level; do not perform any face-to-face service treatment; and do not document any such face-to-face services, clearly stating why such services were required in addition to the services already provided by the NPP. These false billings have been generated by all the NPP Hospitalist mid-levels at Bridgeport Hospital since Dr. Hoq took over as Director of Hospitalists in 2014.

C.     False Split Shared Services Scheme

43.     In order to facilitate this scheme, NEMG actively misstates Medicare's billing rules. On February 20, 2019, NEMG Senior Administrative Associate Hospitalist Department Margaret Bienkowski-Sheppard sent an email entitled MANDATORY EDUCATION MEETING to the entire roster of Hospitalist doctors and mid-levels. Exhibit 5. The Meeting was called and run by NEMG Professional Coding Manager Lori Findley.

NEMG Bridgeport Hospital Hospitalist Business Manager John Palumbo was present, as was Bienkowski, NEMG Director of Hospitalists at Bridgeport Hospital Monique Misra, and a large portion of the Hospitalists.

44.     During that Coding Education Meeting, NEMG Coding Manager Findley told the Bridgeport Hospitalist providers that for Medicare patients, "mid-levels cannot do admissions and discharges at all." Findley stated "it is a very new rule, it just came out in 2019." Similarly, on May 22, 2019 NEMG Coding Manager Findley conducted another billing education meeting for the Hospitalists mid-levels and doctors during which she handed out a Power Point slide stating: "Midlevel providers cannot bill for Admit or Discharge for Medicare (Requires MD attestation and participation)." Exhibit 6.

45.     Those statements are false. CMS has not changed its rules so NPP mid-levels cannot bill for admissions and discharges. NPP still can do so under their own NPI at their 85% rate. But NEMG is actively misleading its providers to believe that is no longer an option. Instead, NEMG is falsely stating that only physicians can bill for mid-level admission or discharge services.

46.     NEMG is misrepresenting CMS billing rules in order to justify falsely billing mid-level services at the 100% physician rate.  The truth is, unless a mid-level admission or discharge service qualifies as a split shared service because a physician performs and properly documents his or her own face-to-face treatment, the encounter can and must be billed at the NPP rate. But NEMG is cloaking that truth with its false and misleading statements.

47.     At the Hospitalist Coding Education Meeting held on February 20, 2019, Coding Manager Lori Findley revealed the motive behind NEMG's false representations:

"So anybody that is a mid-level and they are the servicing provider it is going to hit an edit, for Medicare only, and then we can review because we want to make sure it is going to be done as a split shared service" that is "going to go out under the MD." But as Paragraphs 25-28 above confirm, such mid-level treatments do not qualify as "split shared services" given the absence of the required physician face-to-face documentation. NEMG nevertheless is continuing to submit such false billings to CMS in order to receive payment at the fraudulent 100% rate. At the February 22, 2019 Meeting, NEMG Director of Hospitalists Dr. Monique Misra gave the scheme Findley described her full endorsement.

D.     Examples of Mid-Level Services Falsely Billed at Physician Rate

48.     The following are examples of services performed by mid-levels at Bridgeport Hospital on Medicare or Medicaid patients that were fraudulently billed at the full physician rate. These are charts where the mid-level was correctly listed as both the Service Provider and Billing Provider, but then the mid-level deleted their own name as Billing Provider and inserted a physician's name as Billing Provider. The mid-level then sent the chart to that physician for signing, and the physician cosigned without any face-to-face attestation.

Patient Initials BD and MRN# 581887

Date of Service: 03/05/2019

Mid-Level Service Provider: APRN Richard Amelita

Physician Billing Provider: Dr. Sylvester Ekene Dijeh

Date of Physician Attestation: 03/05/2019 at 8:30 AM

Physician Attestation: "I have reviewed the key parts of the history, exam, laboratory data and plan of care. Please review the note for the details. Patient with past medical history as noted below admitted to the hospitalist service. Findings and plan as below reviewed and confirmed. Sylvester Dijeh MD"

Patient Initials DC and MRN# 793504

Date of Service: 03/05/2019

Mid-Level Service Provider: NP Tenzin Palkey

Physician Billing Provider: Dr. Sylvester Ekene Dijeh

Date of Physician Attestation: 03/05/2019 at 8:30 AM

Physician Attestation: "I have reviewed the key parts of the history, exam, laboratory data and plan of care. Please review the note for the details. Patient with past medical history as noted below admitted to the hospitalist service. Findings and plan as below reviewed and confirmed. Sylvester Dijeh MD"

Patient Initials EC and MRN# 3317947

Date of Service: 02/09/2019

Mid-Level Service Provider: PA Ashley Durchhalter

Physician Billing Provider: Dr. Sylvester Ekene Dijeh

Date of Physician Attestation: 02/13/2019 at 9:08 AM

Physician Attestation: "I have reviewed the key parts of the history, exam, laboratory data and plan of care. Please review the note for the details. Patient with past medical history as noted below admitted to the hospitalist service. Findings and plan as below reviewed and confirmed. Sylvester Dijeh MD"

Patient Initials WB and MRN# 4031182

Date of Service: 02/11/2019

Mid-Level Service Provider: PA Ashely Durchhalter

Physician Billing Provider: Dr. Slyvester Ekens Dijeh

Date of Physician Attestation: 02/13/2019 at 10:42 AM

Physician Attestation: "I have reviewed the key parts of the history, exam, laboratory data and plan of care. Please review the note for the details. Patient with past medical history as noted below admitted to the hospitalist service. Findings and plan as below reviewed and confirmed. Sylvester Dijeh MD"

Patient Initials WW and MRN# 2529.... DOB 8/22/1951

Date of Service: 03/05/2019

Mid-Level Service Provider: APRN Himal Vadav Rai

Physician Billing Provider: Dr. Sylvester Ekene Dijeh

Date of Physician Attestation: 03/05/2019 at 8:18 AM

Physician Attestation:  "Cosigned Dijeh, Slyvester Ekene, MDat 3/5/2019 8:18AM"

Patient Initials RV and MRN# 4061648

Date of Service: 11/20/2018

Mid-Level Service Provider: NP Glorianna Albini

Physician Billing Provider: Dr. Frederick Lopez Apiado

Date of Physician Attestation: 11/20/2018 at 12:53PM

Physician Attestation: "I have seen/evaluated the patient independently. I have discussed the patient with APRN Glorianna Albini and agree with the history, physical exam and plan as documented. Eric L. Apiado, MD"

Patient Initials RV and MRN# 4061648

Date of Service: 11/19/2018

Mid-Level Service Provider: PA Kate E. Schilling

Physician Billing Provider: Dr. Frederick Lopez Apiado

Date of Physician Attestation: 11/22/2018 at 8:50 AM

Physician Attestation:  "I have seen/evaluated the patient independently. I have discussed the patient with PA Kate Schilling and agree with the history, physical exam and plan as documented."

Patient Initials EC and MRN# 3317947

Date of Service: 02/10/2019

Mid-Level Service Provider: PA Claribel Agossto

Physician Billing Provider: Dr. Kumuthini Partheepan

Date of Physician Attestation: 02/11/2019 at 6:03 AM

Physician Attestation:   "I have seen and examined the patient independently. I have reviewed the discharge plan in detail with Claribel Agosto PA. I [sic] with the plan of care. [repeats PA's plan of care]."

Patient Initials GM and MRN# 6033923

Date of Service: 01/22/2019

Mid-Level Service Provider: NP Gloriana Albini

Physician Billing Provider: Dr. Shean L. Barrett

Date of Physician Attestation: 01/22/2019 at 4:13 PM

Physician Attestation: "I saw and evaluated the patient GM. I agree with the findings and the plan of care as documented in the APRN note."

Patient Initials PH and MRN# 1379359

Date of Service: 02/15/2019

Mid-Level Service Provider: PA Melissa H. Chaplik

Physician Billing Provider: Dr. Donu Daniel Bordea

Date of Physician Attestation: 02/15/2019 at 12:17 PM

Physician Attestation: "Patient seen and examined independently. Case discussed with Melissa Chaplik PA. I agree with her findings and plan of care. [repeats PA note]  Daniel Bordea, MD.

Patient Initials PAW and MRN# 3201775

Date of Service: 02/11/2019

Mid-Level Service Provider: APRN Chinenye H. Kalu

Physician Billing Provider: Dr. Frederick Lopez Apiado

Date of Physician Attestation: 02/13/2019 at 10:05 AM

Physician Attestation:  "I have seen/evaluated the patient independently. I have discussed the patient with APRN Chinenye Kaluand agree with the history, physical exam and plan as documented. Eric L. Apiado, MD"

Patient Initials WD and MRN# 2729413

Date of Service: 01/30/2019

Mid-Level Service Provider: PA Alan Olson

Physician Billing Provider: Dr. Sadia K. Gazi

Date of Physician Attestation: 02/05/2019 at 11:54 PM

Physician Attestation: "Cosigned by Gazi, Sadia K., M.D. at 2/5/2019 11:54 PM"

Patient Initials DLR and MRN# 2133 …….. DOB 8/4/1953

Date of Service: 11/12/2018

Mid-Level Service Provider: APRN Fabiola Fleury

Physician Billing Provider: Dr. Moe T. Kyaw

Date of Physician Attestation: 11/13/2018 at 6:-6 PM

Physician Attestation: "Cosigned by: Kyaw, Moe T. MD at 11//13/2018 6:06 PM"

Patient Initials RG and MRN# 340 …….. DOB 2/17/1936

Date of Service: 11/12/2018

Mid-Level Service Provider: APRN Fabiola Fleury

Physician Billing Provider: Dr. Steluta Nedelcuta

Date of Physician Attestation: 11/12/2018 at 11:52 PM

Physician Attestation: "Patient seen and examined independently"

49.     Four examples of charts created by mid-levels on August 9-10, 2018, that reported Dr. Arina Cadriu as the Billing Provider without her knowledge or approval are: Patient TD MRN# 3327685; Patient HB MRN# 3347041; Patient WDN MRN# 2994181; Patient HK MRN# 3534468. In those charts Dr. Cadariu merely included an "Attending addendum" confirming "Patients past medical history reviewed" and "agree with exam findings and plan as outline above by PA/APRN Katherine Capozzi."  Dr. Cadariu did not personally examine the patients and did not describe or attest to doing so. Nevertheless, NEMG inserted her name as the Billing Provider and billed at the 100% physician rate.

E.     Corrected Bills NEMG Changed Back to False Claims

50.     On August 10, 2018, Dr. Arina Cadariu emailed Hospitalist Director Dr. Misra requesting clarification of the role of the supervising physician vis a vis the mid-levels. Dr. Misra did not provide any clarification, and on August 13th Dr. Cadariu sent an Epic internal email to NEMG Chairman of Medicine Dr. Greg Buller asking him to provide "any policies in reference to details of roles and expectations of the supervising Physician working with PA/APRNs . . . particularly in reference of H&Ps and Discharges done by PA/APRNs."

51.     NEMG did not provide Dr. Cadariu with any policy clarifying the billing of cosigned mid-level charts, and on November 21, 2018 Dr. Cadariu again emailed Assistant Hospitalist Director Monique Misra with a copy to Hospitalist Director Dr. Sheik Mahfuz Hoq and Chairman of Medicine Dr. Greg Buller. Exhibit 3. In that email she explicitly referred to the practice of falsely billing for mid-level services with the physician as the Billing Provider, and asked for it to stop. She again asked for NEMG's written Policy stating the criteria for billing mid-level patient encounters at the mid-level or physician provider rate. Her request has been met with silence, and the practice continues unabated.

52.     After she realized what was happening, Dr. Cadariu told the mid-levels not to insert her name as the Billing Provider, and she also began correcting those false claims. For patients with whom she had no involvement, she removed her name as Billing Provider and inserted the name of the mid-level who performed the service as the Billing Provider. Dr. Cadariu then signed the corrected charts and sent them to the NEMG coders for billing. After she took the time to correct the charts, Dr. Cadariu naturally assumed NEMG would bill Medicare correctly.

53.     But even after she corrected the charges and reported the mid-level as the Billing Provider, NEMG code analysts intervened and changed the charges back to her name. She discovered this later when, out of curiosity, she checked on the status of the claims she had corrected, and found to her astonishment NEMG had—without informing her—changed  back the name in the Billing Provider box from the correct mid-level name to her fraudulent physician name.

54.     The first chart she realized had been changed back to fraud was Patient

RD MRN# 3628113. The Service Provider was APRN Fabiola Fleury, who discharged

the Patient as deceased on January 19, 2019. The chart was sent to Dr. Cadariu, who

added an "Attending addendum" confirming "Patients past medical history reviewed.

Patient was seen by midlevel provider as recorded above and pronounced. Note above

my midlevel provider reviewed." Dr. Cadariu then physically removed her name from the

Billing Provider box and inserted mid-level Fleury's name. However, when Dr. Cadariu

later went back to check the chart's billing page, she saw a coder had changed the name

in the Billing Provider box back to Dr. Cadariu.

55.     Another example of charts where Dr Cadariu corrected the name in the

Billing Provider box but the coders changed it back to her name without her permission

is:

Patient Initials MEV and MRN# 3180533

Date of Service: 01/15/2019

Mid-Level Service Provider: APRN Fabiola Fleury

Physician Billing Provider: Dr. Arina R. Cadariu

Date of Physician Attestation: 01/15/19 6:59 PM

Physician Attestation: Dr. Cadariu did not report any face-to-face: "Attending addendum:
Patients past medical history reviewed. Patient was seen by midlevel provider as
recorded above. Note above by Midlevel provider reviewed."

56.     Other examples of charts where Dr. Cadariu correctly entered the name

of the mid-level as the Billing Provider but the NEMG coders changed the name in the

Billing Provider box back to Dr. Cadariu's are:


Patient EEF MRN# 2786630

Date of Service: 03/18/2019

Mid-Level Service Provider: PA Ashley Durchhalter

Corrected Billing Provider: PA Ashley Durchhalter

NEMG coders changed Billing Provider back to: Dr. Arina Cadariu

Patient MWS MRN# 3336957

Date of Service: 02/12/2019

Mid-Level Service Provider: APRN Himal Yadav Rai

Corrected Billing Provider: APRN Himal Yadav Rai

NEMG coders changed Billing Provider back to: Dr. Arina Cadariu

## XII.    FALSE DISCHARGE BILLINGS

57.    CMS confirms that only the provider who personally performs the face-to-face pronouncement of death can bill under Codes 99238 or 99239. This means if a mid-level provides the death pronouncement service it cannot be billed under a physician's name.

58.    But at Bridgeport Hospital, all declarations of death performed by the mid-levels are then billed with the attending physician as the Billing Provider. Similarly, all of the discharge services performed by mid-levels (as opposed to discharges performed by an attending physician) are billed by the mid-level with the attending physician as the Billing Provider. This despite the fact those patients were not treated or even seen by the attending physician prior to the patients leaving the Hospital.

59.    CMS specifically prohibits this kind of up charging for declaration of death and discharge services performed by mid-levels. An example of such up charging is Patient RD MRN# 3628113. The Date of Service was January 19, 2019, and the Service Provider was APRN Fabiola Fleury. Mid-level Fleury pronounced Patient RD dead and then stated the case "will be discussed with" Dr. Cadariu and sent Dr. Cadariu the chart

to cosign. The case was never discussed with Dr. Cadariu, and Dr. Cadariu clearly stated in her attestation that the patient was not seen by her. Nevertheless, mid-level Fleury submitted the "discharge summary" charge with Dr. Cadariu as the Billing Provider.

60.     In addition, NEMG systematically up codes discharges based on false declarations of time. Dr. Wigneswaran W. Paramanathan uses templates to report every progress and discharge note billed under his name as more than 35 minutes. As a result, he routinely overbills his time. For example, on February 12, 2019, he started his shift at 9 am and by 2:19 pm had billed for 8.83 hours of time.

61.     At the February 20, 2019 Coding Education Meeting, Findley cited Dr. Paramanathan as an exemplar for others to follow, and instructed everyone to bill discharges based on time. She looked at Dr. Charles Kochan, who up to that point did not bill discharges based on time, and stated "Dr. Kochan make sure you put in time." Dr. Kochan responded, "I am going to start doing the time, I'll put an extra 30 minutes in there, the statement is kind of phony." Later on in that Meeting, mid-level PA Alan Olson commented, "We bill more than 35 minutes, but we never spend 30 minutes."

62.     Since the February 20, 2019 Meeting, all the Bridgeport Hospitalist physicians and mid-levels routinely bill discharges at more than 30 minutes, including Dr. Kochan. For example, by 8:23 am on the morning of March 13, 2019, Dr. William Cheuk had billed 8 discharges at more than 30 minutes each, despite starting his shift at 8 am.

### XIII.   FALSE RESIDENT CONSULT BILLINGS

63.     Doctor consult notes are billable to Medicare, and if it is medically necessary one doctor can order another doctor to perform a consultation. But doctors cannot order *themselves* to do a consultation in order to create a billable event, especially when the consultation is medically unnecessary.

64.     On April 25, 2019, Dr. Cadariu confirmed a scheme by NEMG Hospitalist managers Drs. Hoq, Dr. Misra, and PCU Medical Director Dr. Sadia Gazi to generate false consult note billings. Dr. Cadariu noticed Dr. Gazi had inserted a notice at the top of all Epic EHR computer screens stating: "Residents MUST place PCU consult on all evaluations." Exhibit 7.

65.     The PCU refers to the Progressive Care Unit, which is the level of care between the Intensive Care Unit and the regular inpatient Hospitalist treatment. The "evaluations" refer to informal requests from Emergency Room providers for Hospitalists to see if PCU treatment is indicated. Such requests are not actual consult orders by an Emergency Department physician, they are simply requests that a Hospitalist make a cursory check to see if the patient warrants referral to the PCU. As a courtesy, Hospitalists will do so, usually noting words to the effect "PCU care not warranted." It is not a billable event because the Emergency Department doctor does not actually enter a consultation order in the patient's chart.

66.     Dr. Gazi's instruction to the residents generates false consult billings because: (a) there is no actual consultation order in the chart entered by a different doctor, (b) the residents are ordering *themselves* to perform the consultation, and (c)

the resulting "consultation" is medically unnecessary, as it usually consists of words to the effect "PCU care not warranted."

67.     On April 25, 2019, Hospitalist Senior Resident Dr. Anton Stolear explained the meaning of the computer screen notice requiring residents to "place PCU consult on all evaluations." Dr. Stolear explained "for billing purposes you have to place a PCU . . . so the Billing Department can track all consults placed to PCU and they can bill. . . There is a note, but there is no official consult noted placed in the system." This confirms that even though a different doctor has not entered an official consultation order in the chart, the residents are instructed to go ahead and report they performed a consultation in order to create a billable event for the NEMG Billing Department.

68.     On April 28th Dr. Cadariu checked to see how the residents were following Dr. Gazi's instruction. In the Epic EHR Manage Orders screen listing all the orders entered by interns/residents, Dr. Cadariu saw that an "Inpatient Consult to Progressive Care" order was listed. When Dr. Cadariu clicked on that order, the screen that came up showed that on April 28, 2019 Dr. George Stamatiades ordered an "Inpatient Consult to Progressive Care" on behalf of the Emergency Department.

69.     Dr. Stamatiades is a first year intern resident assigned to the Internal Medicine residency training program. On April 28, 2019, he was not a physician or a resident in the Emergency Department, but was assigned to the Internal Medicine floor with Dr. Cadariu as his attending supervisory physician. As an intern in the Internal Medicine, Dr. Stamatiades cannot enter any orders without Dr. Cadariu's knowledge and approval. He also cannot enter any orders for any Department other than the

Internal Medicine Department. Specifically, he cannot enter any orders on behalf of any Emergency Department attending physician.

70.     Nevertheless, the Epic record shows that Dr. Stamatiades ordered a Consult to Progressive Care on behalf of the Emergency Department. He did so without Dr. Cadariu's knowledge or approval. He did so without any authority to enter an order on behalf of the Emergency Department. The record also states "Authorizing: Pagan, Krystal, MD," but Dr. Pagan is not a physician in the Internal Medicine Department and has no authority to approve any orders by an Internal Medicine intern resident.  If Dr. Pagan had actually ordered a consult, she would be listed as the "Ordering" (or one of her own residents she approved would be listed as the "Ordering").The only purpose of referring to Dr. Pagan as "Authorizing" is to trick the computer software into treating the intern's self-referral as a billable consult note.

71.     Dr. Gazi's PCU consult instruction has been posted at the top of the computer screen for years, and the residents have been following its instructions accordingly.

## XIV.   FALSE PROGRESS NOTES

72.     Medicare treats the reimbursement of mid-level Consult Notes and mid-level Progress (or Follow Up) Notes differently. Medicare does not reimburse for Consult Notes created by a mid-level, and such Notes must be cosigned by a physician. Medicare does reimburse for Progress Notes created by a mid-level, and such Notes do not have to be cosigned by a physician.

73.     At Bridgeport Hospital, Consult Notes created by mid-levels during the day and night shifts are sent to the attending physician for cosigning. The Consult Notes

then are sent to the NEMG charge code analysts. Such mid-level Consult Notes are not reimbursable by Medicare. To bill Medicare for them nevertheless, the NEMG coders convert the Consult Note into a Progress Note and falsely bill it under the name of the physician who cosigned the Consult Note. The coders do this without notifying the physician.

74.    Every month NEMG issues to each doctor a "Hospitalist Scorecard" showing the number of CPT Codes billed under their name. Dr. Cadariu's August 2018 Scorecard confirms NEMG submitted CPT charges under her name for 69 Progress Notes she never created, and her September 2018 Scorecard confirms NEMG billed for 69 Progress Notes she never created. Those are examples of mid-level Consult Notes NEMG converts into physician Progress Notes in order to fraudulently bill them under the name of the physician who merely cosigned the mid-level Consult Note. This practice applies to all the mid-level Consult Notes, and has been going on for years.

## XV.    DAMAGES

75.    All of the claims for physician services NEMG submits to CMS are conditioned on NEMG's certification that each claim is a true and accurate reflection of the medically necessary services actually provided to the patient. If CMS knew it was being presented with systemically fraudulent claims violating the most fundamental conditions of Medicare and Medicaid claims payment, CMS would not approve payment for any of them.

76.    Approximately 80% of the patients treated at Bridgeport Hospital are covered by Medicare or Medicaid. The number of false claims submitted to CMS identified above number in the several thousand each year, and have been submitted

to CMS at least since 2014. For each of those years, the amount of fines for such claims reaches into the millions, as does the amount of fraudulent dollars CMS paid NEMG for those claims.

### XVI.   LEGAL CLAIMS FOR RELIEF

77.    The Relator Arina Cadariu alleges that the conduct of the Defendants detailed above violates the False Claims Act ("FCA") of the United States, 31 U.S.C. §§ 3729-3733, and the False Claims Act statute of the State of Connecticut.  Relator brings these claims on behalf of the Federal and State governments as well as on her own behalf.

### FIRST CAUSE OF ACTION
(False Claims Act: Presentment of False Claims)
31 U.S.C. § 3729(a)(1)(A)

78.    The United States re-alleges and incorporates by reference paragraphs 1 through 76 as though fully set forth herein.

79.    Defendants knowingly presented false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to the United States.

80.    By virtue of this conduct, the United States suffered damages and therefore is entitled to statutory damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## SECOND CAUSE OF ACTION

(False Claims Act: Making or Using False Record or Statement)

31 U.S.C. § 3729(a)(1)(B)

81.    The United States re-alleges and incorporates by reference paragraphs 1 through 76 as though fully set forth herein.

82.    Defendants knowingly made, used, or caused to be made or used, false records or false statements material to getting false or fraudulent claims paid or approved by the United States.

83.    By virtue of this conduct, the United States suffered damages and therefore is entitled to statutory damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## THIRD CAUSE OF ACTION

(Conspires to Commit Violation of False Claims Act)

31 U.S.C. §§ 3729(a)(1)(C)

84.    The United States re-alleges and incorporates by reference paragraphs 1 through 76 as though fully set forth herein.

85.    Through the above-described acts and omissions, the Defendants entered into a conspiracy or conspiracies among themselves to defraud the United States Government by knowingly presenting, or causing to be presented to officers, employees, or agents of the United States Government false or fraudulent claims for payment of approval in violation of 31 U.S.C. § 3729(a)(1)(C), and continue to do so.

86.    The Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

87.     The United States Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

88.     By reason of the above-described presentment of false and fraudulent claims, the United States has suffered significant losses in an amount to be determined at trial, plus a civil penalty for each violation.

## FOURTH CAUSE OF ACTION

(Connecticut False Claims Act: Presentation of False Claims)
Conn. Gen. Stat. § 4-275 (a) (1)

89.     The State of Connecticut realleges and reincorporates paragraphs 1 through 76 as if fully set forth herein.

90.     Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval.

91.     By virtue of the false or fraudulent claims made by the defendants, the State of Connecticut suffered damages and therefore is entitled to statutory damages under the Connecticut False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## FIFTH CAUSE OF ACTION

(Connecticut False Claims Act: Making or Using False Record or Statement)
Conn. Gen. Stat. § 4-275 (a) (2)

92.     The State of Connecticut realleges and reincorporates paragraphs 1 through 76 as if fully set forth herein.

93.     Defendants knowingly made, used, or caused to be made or used, false records or false statements material to a false or fraudulent claim.

94.     By virtue of the false records or false statements made by the defendants, the State of Connecticut suffered damages and therefore is entitled to statutory damages under the Connecticut False Claims Act, to be determined at trial, plus a civil penalty for each violation.

### SIXTH CAUSE OF ACTION

(Connecticut False Claims Act: Conspires to Present
or Use False Record or Statement)

Conn. Gen. Stat. § 4-275 (a) (3)

95.     The State of Connecticut realleges and reincorporates paragraphs 1 through 76 as if fully set forth herein.

96.     Through the above-described acts and omissions, the Defendants entered into a conspiracy or conspiracies among themselves to defraud the State by knowingly presenting, or using false or fraudulent claims in order to receive payment in violation of State law, and continue to do so.

97.     The State, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

98.     By virtue of the false records or false statements made by the defendants, the State of Connecticut suffered damages and therefore is entitled to statutory damages under the Connecticut False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## PRAYER FOR RELIEF

**WHEREFORE**, the Relator Arina Cadariu, on behalf of herself and the United States and the State of Connecticut, demands that judgment be entered in her favor and against the Defendants for the maximum amount of damages and for such other relief as the Court may deem appropriate on each Cause of Action.  This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than $22,363 and no less than $11,181 for each false claim, all costs and expenses including attorney fees, and any other recoveries or relief provided for under the Federal False Claims Act.

With respect to the State of Connecticut statutes cited above, this Request also includes the maximum damages permitted by those statutes and the maximum fine or penalty permitted by those statutes, all costs and expenses including attorney fees, and any other recoveries or relief provided for under the State Connecticut False Claims Act.

Further, Relator requests that she receive the maximum amount permitted by law of the total proceeds of this action or settlement of this action collected by the United States and the State of Connecticut, plus reasonable expenses necessarily incurred, and reasonable attorney's fees and costs.  Relator requests that her award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

***A jury trial is demanded in this case.***

Dated: June *11*, 2019

RESPECTFULLY SUBMITTED,

ATTORNEY FOR RELATOR
ARINA CADARIU:

By: _____
Charles C. Goetsch, Esq.  [ct00776]
CHARLES GOETSCH LAW OFFICES, LLC
405 Orange Street
New Haven, CT  06511
Tel.:  (203) 672-1370
Fax:  (203) 776-3965
E-mail:  charlie@gowhistleblower.com